**MATUSEK ACADEMY OF MUSIC, Inc.
v. NATIONAL SURETY CORP.**

**MATUSEK ACADEMY OF MUSIC, Inc.
v. MARYLAND CAS. CO.**

Civ. A. Nos. 51 C 275, 51 C 276.

United States District Court
N. D. Illinois, E. D.

Feb. 13, 1953.

Simon Herr, Chicago, Ill., for plaintiff.

Lent, Hampton & Doten, Chicago, Ill., for defendants.

PERRY, District Judge.

On January 29, 1951, the plaintiff, an Illinois corporation, filed two actions in the Superior Court of Cook County whereby it seeks recovery from two insurance corporations. In one action, the plaintiff seeks to recover the sum of $7,500 from the National Surety Corporation, a New York corporation, on a contract of insurance known as "Mercantile Open Stock Bur-

glary Policy." In the other action, the plaintiff seeks to recover $7,500 from the Maryland Casualty Company, a Maryland corporation, on a contract of insurance, which is known as "Standard Mercantile Open Stock Burglary Policy." By reason of the diversity of citizenship of the parties, with requisite jurisdictional amount, both actions were removed to the United States District Court. 28 U.S.C.A. § 1441 (a). Since both actions involve a single loss and since the plaintiff seeks to recover on virtually identical separate policies, there is a common question of law and fact; the actions have been consolidated pursuant to Rule 42(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. The facts are stipulated.

On or about August 16, 1949, the Chicago Mercantile Policies Alarms Systems, owned and operated by Clarence Novak, installed a burglar alarm system with an outside gong, manufactured by A. W. Fruh and Company of Chicago, Illinois, on the plaintiff's premises, which were located at 2649–53 West 63rd Street, Chicago, Illinois. Mr. Novak had secured a classification for this system by Underwriters Laboratories, Inc., of Chicago, Illinois, under Certificate No. 603,306, issued August 16, 1949, as "Class A, Installation 3," effective for a period of three years. This certificate also embodied the following proviso: "Underwriters Laboratories, Inc., reserves the right to inspect this equipment at any time, and to revoke this certificate if the entire system is not properly maintained under contract with the installing company."

The installation of this burglar alarm system was made pursuant to a written agreement, dated August 16, 1949, between the plaintiff corporation and Clarence W. Novak. Mr. Novak did not have a key to the plaintiff's premises or access thereto at times when they were closed for business purposes; he never requested a key to the plaintiff's premises. Neither of the defendants had any knowledge concerning this agreement between the plaintiff and Mr. Novak until November 20, 1950.

On November 8, 1949, the defendant, National Surety Corporation, for a premium of $240, paid by the plaintiff, executed and delivered to the plaintiff a mercantile open stock burglary policy. This policy was to be effective from November 8, 1949, to November 8, 1952. It was originally issued in the amount of $5,000; by a rider, dated May 19, 1950, the amount of insurance was increased to $7,500.

The policy recites that the defendant had made this insurance agreement "in consideration of the payment of the premium and in reliance upon the statements in the Declarations and subject to the limits of liability, exclusions, conditions and other terms of this policy."

Declaration No. 9 in this policy reads as follows:

"Premises *are* equipped with a *Chicago Mercantile Police Alarm,* burglar alarm system, which will be maintained and kept in proper working order when premises *are not* open for business, while this policy is in force. Keys to the premises are not in possession of the alarm company. Such alarm system is classified by Underwriters Laboratories as follows: Class *A* installation *3,* Certificate No. *603,306, 8–16–49,* expires *8–16–52,* such alarm system is connected with an outside, central station or with an alarm gong on the outside of the premises— *gong alarm.*"

The italicized items of this Declaration were filled in after the necessary information was obtained from the insured; the balance is a printed part of the contract of insurance.

Under exclusions, this policy provides that

"the company shall not be liable for loss or damage; (d) contributed to by any change in the difference of the risk; (f) occurring while the protection or services promised in items 8 or 9 of the declarations is not maintained."

Paragraph 15 of the policy conditions reads as follows:

"By the acceptance of this policy the named insured agrees that the statements and the declarations are his

agreements and representations, that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between himself and the company or any of its agents relating to this insurance."

On May 27, 1950, the American Casualty Company for a premium of $322.50, paid by the plaintiff, executed and delivered a standard mercantile open stock burglary policy to the plaintiff. This policy, issued in the amount of $7,500, was to be effective from May 27, 1950, to May 27, 1953.

Item 10 of the Declarations reads as follows:

."The *A. W. Fruh and Co.* burglar alarm system *is* maintained and will be kept in proper working order and connected at all times when the premises are not open for business while this Policy is in force. Such alarm system is classified by Underwriters' Laboratories, Inc., as follows: Class *A* Installation *3* Certificate No. *603,306* issued *August 16th,* 1949, expiring *August 16th*, 1952, and protects:

"(a) completely all windows, doors, transoms, skylights and other openings leading from the premises, and all ceilings, floors, and hall, party, partition and building walls enclosing the premises, except building walls which are exposed to street or public highway and except for that part of any building wall which is at least two stories above the roof of an adjoining building, *no*;

"(b) with traps all inaccessible windows, and with screens (or foils and traps) all accessible windows (except stationary show windows), and all doors, transoms, skylights and other openings leading from the premises; and also protects all ceilings and floors not constructed of concrete, and all hall, party and partition walls enclosing the premises, *no*;

"(c) with screens (or foils and traps) all accessible windows (except stationary show windows), and all doors, transoms, skylights and other openings leading from the premises,

*yes.* Such alarm system is connected with an outside central station or with an alarm gong on the outside of the premises, *gong.* Keys to the premises *are not* in the possession of the alarm company."

Italicized items were filled in after the necessary information was obtained from the insured; the balance of this Declaration is a printed part of the contract of insurance. Under the exclusions this policy provides that:

"The company shall not be liable for loss or damage (4) attributed to by any change in the condition of the risk, or (6) occurring while the protection or service promised in items 10 and 11 of the Declarations is not maintained."

It is further provided under the conditions and limits of this policy as follows -

"The statements and the Declarations are represented by the assured to be true. This policy is issued in reliance upon the truth of said statements and in consideration of the payment of the total premium expressed therein. By acceptance of this policy the assured agrees that it embodies all agreements existing between himself and the company or any of its agents relating to this insurance."

The defendants, as well as other surety insurance companies, issued and sold their respective burglary policies for uniform rates of premium. The premiums for such policies varied in amount, depending upon whether the insured's premises were protected by a burglar alarm system, the type of system installed by the insured on his premises, and the extent of the insurance coverage afforded by and the terms and provisions of such policies.

In November 1949, the regular and customary premium charge of the National Surety Corporation for a policy in the amount of $5,000 covering an insured in the City of Chicago where the insured had not complied with the above mentioned conditions relative to the burglar alarm system was in the sum of $300. The premium charge for such a policy where the insured

had complied with these conditions was the sum of $240. In May 1950 the premium charge of the American Casualty Company for this type of policy in the amount of $7,500 where the insured had not complied with these conditions was $403.13. In case of compliance, the premium charge was $322.50.

Leroy E. Jannush opened the plaintiff's premises for business on the morning of November 18, 1950, disconnected the alarm system, and found that it was in working order. On Saturday, November 18, 1950, Mr. Jannush, who is employed as office manager and bookkeeper, and Mr. Ben C. Matusek, president of the plaintiff corporation, were the last to leave the plaintiff's business premises. Mr. Jannush on preparing to leave about 7:00 P.M. turned on the burglar alarm system and the gong alarm; he found that it would not operate and that it was not in proper working order. On checking the system, he found a broken wire at the wooden double door in the back of the plaintiff's premises. He repaired this wire break and, trying the gong alarm once, again found that it still would not operate. He immediately called Mr. Novak by telephone and was advised by a girl that Mr. Novak was not in. Mr. Jannush conveyed a message regarding the failure of the alarm system and she informed him that, due to the hour, no one was then available to make repairs until the following Monday. He then informed Mr. Matusek that the alarm system was not working and that he had reported the difficulty to the Chicago Mercantile Police Alarm System. Mr. Jannush then left the plaintiff's premises about 7:10 P.M.

About 8:45 P.M. on November 18, 1950, Matt Burger, plaintiff's sales manager, called at the plaintiff's premises for Mr. Matusek in order to drive him to the airport. When they were locking the premises, Mr. Matusek tested the alarm system and the gong alarm and, upon turning the key to the front door found that no connection was made and that the alarm would not operate. Normally, when such key is turned, a tinkling sound is heard which indicates the gong alarm is connected and in proper working order. The absence of this tinkling sound indicated to them that the alarm was not then working. Mr. Matusek then telephoned the Chicago Mercantile Police Alarm Systems and advised them of this failure. The person who answered the phone informed Mr. Matusek that no one was available to make repairs at that hour and that someone would call at the plaintiff's premises to attend to the matter the following Monday morning. Mr. Matusek then locked the plaintiff's premises and left with Mr. Burger.

Between 8:45 P.M. on November 18, 1950, and approximately 1:30 P.M. on November 19, 1950, none of plaintiff's officers or employees was present in or at the office of said place of business and it was not open for business purposes. The burglary was first discovered by plaintiff about 1:30 P.M. on November 19, 1950, when Leroy E. Jannush and Matt Burger entered the plaintiff's premises. The police were notified immediately. Investigation disclosed that access had been gained to the plaintiff's premises by sawing off metal bar across one of the windows at the rear of plaintiff's premises and breaking the window pane. Exit had been made through a double door at the rear of plaintiff's premises by removing the screws on the hasp by which said door was fastened.

The total amount of the loss, consisting primarily of accordions, was $15,525. The total cost of the plaintiff's stock on its premises as of the close of business on November 18, 1950, was $47,327.84.

The burglar alarm system and gong alarm system at plaintiff's premises were not repaired at any time between the time the plaintiff closed his place of business about 8:45 P.M. on Saturday, November 18, 1950, and November 20, 1950, when Clarence Novak called to make such repairs. He called at 3:00 P.M. He found that the alarm system was not in operating condition and that the batteries serving the alarm system had run down and were exhausted, although such a battery had been installed in said system about one month prior to November 20, 1950. Normally, such battery would have lasted for a period of about eighteen months. He also found a knife scratch on a rear window and a wire,

which was part of the alarm system, pulled off at the door cord at the bottom of the double door at the rear of plaintiff's premises. Any one of the defects found by Mr. Novak would have caused the gong alarm connected with the alarm system to ring if the system had been in operating condition. Mr. Novak repaired such defects and replaced the exhausted battery on November 20, 1950, and, upon testing the alarm system and gong, he found they would operate.

The alarm failure of November 18, 1950, was the second consecutive Saturday that the alarm system and gong alarm at the plaintiff's premises were not in proper working order. On Saturday, November 11, 1950, plaintiff discovered that some unknown person had thrown a rock through the rear west window of plaintiff's premises. Before the plaintiff's premises were closed for business on November 11, 1950, plaintiff temporarily repaired the break in such window by causing a two inch wide gum conductor tape to be placed over the break in such window, which placed the alarm system and gong in operating condition. On the following Monday the broken pane in such window was replaced.

Within the times specified in each of the policies, the plaintiff wrote the parties issuing the insurance, to give notice to each, the National Surety Corporation and the Maryland Casualty Company, of the loss claimed by plaintiff, and filed with each of them a proof of the alleged loss claimed by plaintiff. Each company promptly returned such proofs of loss to the plaintiff with an accompanying letter, stating that the loss claimed was not covered by the mercantile open stock burglary policy issued to the plaintiff.

Underwriters' Laboratories, Inc., was organized in October 1936 as a non-profit corporation under the laws of the State of Delaware. It has its principal office at 207 East Ohio Street, Chicago, Illinois, maintains laboratories and testing stations in Chicago, New York and San Francisco. The officers of this corporation consist of a chairman, president, two or more vice presidents, secretary and treasurer, all elected by a board of trustees having six-teen members. The trustees are elected by regular and associate members of the corporation, manage and control the property and affairs of the corporation.

Membership in this corporation consists of regular and associate members. The regular members are the original six incorporators, the National Board of Fire Underwriters and the officials of this board or of any company members as may be elected by a majority of the members. Associate members consist of such other persons, firms or corporations as are elected by a majority of the board of trustees. This corporation derives all of its income from contracts for investigation or re-examination services with customers, consisting of owners, builders, manufacturers and assemblers of physical products, under which contracts this corporation investigates, tests, inspects and re-examines buildings, materials, devices and methods, with reference to the life, fire and casualty hazard pertinent to the device or the use thereof. It also derives income from dues submitted by its members.

When a customer applies to Underwriters' Laboratories, Inc., for either its testing, re-examination, certificate or label service, staff employees of the Laboratories first examine, test, experiment with and prepare a report of their findings and conclusions concerning the material, devices or methods under consideration. Such staff report is then submitted to one or more of five engineering councils of Underwriters' Laboratories, Inc., designated as the Fire, Automotive, Casualty, Electrical and Burglary Protection Councils. These councils are made up of men having wide field experience. The council members may approve, or they may make suggestions, or they may criticize the staff report; but the services, final reports, listing requirements and conclusions submitted by Underwriters' Laboratories, Inc., to its customer represent only the independent judgment of Underwriters' Laboratories, Inc. If the building, material, device or method which these laboratories have contracted to examine and test meets with its safety requirements the person or company requesting such examination is given a certificate and a listing.

During 1950, A. W. Fruh & Company of Chicago, Illinois, on its application was classified and listed by the Underwriters' Laboratories, Inc., as a manufacturer whose Ace Heavy Duty Alarm, designed for use in local mercantile burglar alarm systems, meets with the Grade A requirements and standards of these laboratories. During 1949 Clarence Novak, doing business as Chicago Mercantile Police Alarm Systems, applied to and on August 15, 1949, was classified and listed by Underwriters' Laboratories, Inc., as an installing Company qualified to furnish and install Grade A Mercantile Burglar Alarm Systems. Clarence Novak was also a subscriber during 1949 and 1950 for Underwriters' Laboratories, Inc.'s examination and certificate service, under which the laboratories furnished to Clarence Novak certificates at twenty-five cents per certificate, which he could issue to his customers for whom he installed alarm systems. The certificate states that installing company is listed by Underwriters' Laboratories, Inc., as an installing company, furnishing Grade A Local Mercantile Burglar Alarm Systems, meeting the requirements of Underwriters' Laboratories, Inc., for such class of alarm. Under its re-examination and certificate service, Underwriters' Laboratories, Inc., inspects each original installation by Clarence Novak to determine that he has met the requirements of the laboratories. Thereafter, it makes additional inspections of such installations on the average of every three years.

The standard requirements adopted by Underwriters' Laboratories, Inc., for Grade A and Grade B Local Burglar Alarm Systems, which requirements were in force during 1950, include among others the following:

"However, it is required that local systems be maintained under the care and regular inspection service of the installing company. The installing company is expected to respond to troubles or calls for services promptly on report of the owner. It is the responsibility of the owner to switch the protection on and off duty and to report improper functioning of the system to the service company.

\* \* \* \* \* \*

"Mercantile Premises Alarms
"Common Requirements for
Grades A and B

"The operating company shall maintain at least one employee on duty to to receive trouble calls during the regular business hours and also during such other periods as experience may show to be necessary.

"The maintenance of at least one employee to receive trouble calls during business hours may be determined by inquiry to users and by making telephone calls to the alarm office at various periods during which regular business houses are open.

"At least one individual telephone line (not party line) should be maintained by the alarm company listed on its own name.

"Trouble calls received before 12:00 noon shall be responded to the same day and troubles thereafter shall be responded to not later than the business day following.

"Operating company shall maintain authorized service stations in sufficient number and so distributed throughout the territory served to insure compliance with the foregoing specification. Service stations shall employ at least one expert repair man and shall maintain on hand an adequate stock of such parts and materials as is required fully to maintain all equipment in its territory."

Such requirements were established by Underwriters' Laboratories, Inc., as the minimum standard of maintenance and repair service which an installing company would be required to provide before Underwriters' Laboratories, Inc., would certify or list such company as a qualified installing company or would provide to such company certificates or labels for reissuance to its customers. All of such requirements were formulated and established by the Underwriters' Laboratories, Inc., as a result of the exer-

cise of the independent judgment of its staff members.

No relation exists between these laboratories and the defendant corporations, by way of membership, subscription or contribution, nor does any relationship exist between A. W. Fruh and Company or Clarence Novak, doing business as Chicago Mercantile Police Alarm Systems, and the defendant corporations.

The defendants contend that the plaintiff's declaration in each policy, that its premises are equipped with a burglar alarm system with outside gong, which will be kept in proper working order and connected at all times when the premises are not open for business, is a promissory warranty which requires literal compliance in order that the plaintiff might recover. Since the alarm system was not in proper working order at the time of the burglary, the plaintiff failed to comply with this warranty. Therefore, the defendants are not liable.

■ Since federal jurisdiction in the instant case is based solely on diversity of citizenship, the rights of the parties will be determined by local law. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L. Ed. 1188.

■ Insurance contracts should be liberally construed in favor of the insured, so as not to defeat, without a plain necessity, his claim to the indemnity. Healy v. Mutual Accident Association, 133 Ill. 556, 25 N.E. 52, 9 L.R.A. 371; Kaplan v. U. S. Fidelity & Guaranty Co., 255 Ill.App. 437, affirmed 343 Ill. 44, 174 N.E. 834. The insured should not be deprived of the benefit of insurance for which he has paid, except where the terms of the policy clearly, definitely and explicitly require it. Midwest Dairy Products Corp. v. Ohio Casualty Ins. Co., 356 Ill. 389, 190 N.E. 702.

In the case of Kaplan v. U. S. Fidelity & Guaranty Co., supra, the plaintiff sought recovery upon an insurance policy whereby the defendant undertook to indemnify him from loss on account of interior robbery. One of eighteen declarations in the policy provided that one or more custodians should be on duty on the premises during the hours specified in the policy. The policy also pro-

vided that a custodian shall mean: "(4) any person not less than seventeen nor more than sixty-five years of age, who is in the regular employ of the assured and duly authorized by him to act as paymaster, messenger, cashier, clerk or sales person, and while so acting to have the care and custody of property covered thereby. In no event shall a watchman or a porter be considered a custodian." The policy also provided that it was issued in consideration of the truth of these declarations and the payment of the premium. The evidence showed that the robbery was committed while the plaintiff's employee was cleaning the premises and preparing them for the day's business. This employee's regular duties consisted of cleaning the shop premises, receiving and signing for packages ordered by the proprietors and delivering merchandise and collecting money on C.O.D. packages. In overruling the defendant's contention that the provision in the contract with reference to the presence of a custodian was a promissory warranty and, as such, it required literal fulfillment, the Appellate Court said: "We do not understand that rule to be applicable to promissory warranties such as those considered here, but on the contrary we hold that such are in the nature of conditions, subsequent and that substantial compliance therewith is sufficient."

■ This ruling is applicable to the instant case. Insofar as the policies under consideration in both cases provide for the performance of an act during the existence of the policies, the cases are analogous. Furthermore, the policy, under consideration in the cited case, was issued in consideration of the truth of the declarations and the payment of the premium. This is not true of the policies in the instant case. In this respect, the defendant in the Kaplan case had a stronger position that the defendants in the case before the bar.

■■ In its determination of the sufficiency of performance of the conditions in a contract of insurance, the Court will proceed with a view of the intention of the contracting parties. In arriving at this intention regard must be had to the object and

purpose which were intended by the contracting parties. Healy v. Mutual Accident Association, supra. A policy of burglary insurance is issued and accepted for the purpose of furnishing indemnity against a burglary loss. Unless such contract expressly provides that literal compliance with any condition or declaration is a condition precedent to the insurer's liability, this Court subscribes to the view that they are considered in the nature of conditions subsequent and that substantial compliance is sufficient.

The Court does not view the provision in these policies relating to the maintenance of a burglar alarm system, as an isolated clause in a declaration. The declaration must be considered in its entirety; and, since the insurer has imported an external standard into the contract of insurance, this declaration, the related provisos and the performance thereof must be viewed in the light of the regulations and policies which govern the administration and execution of this external standard. The evidence shows that the plaintiff maintained the system throughout the life of the policies. The failure, occurring a week prior to the burglary, was repaired and the alarm system was restored to proper working order. On November 18, 1950, the plaintiff discovered the failure late in the day. Mr. Novak's firm was notified twice. On both occasions, the plaintiff was informed that no service could be rendered that day. This was within the regulation of Underwriters' Laboratories, Inc., which provides that calls received after twelve o'clock noon must be serviced by the end of the next business day. At this point, the plaintiff could have sought service elsewhere. It would have, however, jeopardized his certification by Underwriters' Laboratories, Inc., which reserved the right to revoke the certification "if the entire system is not properly maintained under contract with the installing company." And yet, it was required to maintain the system according to this standard. Unless this Court is to rule that the plaintiff is to bear the burden of the effect of the regulation relating to service calls received after twelve o'clock noon, the plaintiff by its two notifications rendered all possible performance under the circumstances. The defendants imported the standard of the Underwriters Laboratories, Inc., into its contract. In the absence of express language to the contrary, it is reasonable to say that the defendants have adopted it as it is being administered in the practical business world, and not as an abstract entity.

A contrary view would reduce the alarm system clause to a virtual nullity. Such a view would demand an installation certified by Underwriters' Laboratories, Inc., and yet, by virtue of the regulation relating to service calls, the insured might be required to seek maintenance service elsewhere thereby facing the possibility of forfeiture of the certificate. The Court considers this an unreasonable interpretation with an impractical result. In the absence of express language, imposing upon the insured the absolute duty to maintain the alarm system in accordance with a standard regardless of any obstacle in obtaining repair service, reasonableness and practicality demand the ruling that the insured, as in the case before the bar, has performed when he has properly notified the certified repair service and that he will not be penalized by the delay of such service, authorized by the regulations of its own association.

Accordingly, judgment will be entered for the plaintiff.